Michael R. Lozeau (State Bar No. 142893)
Marjan R. Abubo (State Bar No. 349361)
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
E-mail: michael@lozeaudrury.com
        marjan@lozeaudrury.com

Barak J. Kamelgard (State Bar No. 298822)
Benjamin A. Harris (State Bar No. 313193)
LOS ANGELES WATERKEEPER
360 E 2nd St., Suite 250
Los Angeles, CA 90012
Tel: (310) 394-6162
E-mail: barak@lawaterkeeper.org
        ben@lawaterkeeper.org

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California nonprofit corporation,<br><br>           Plaintiff,<br><br>    vs.<br><br>DYWIDAG SYSTEMS INTERNATIONAL, USA, INC., a New York corporation,<br><br>           Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

LOS ANGELES WATERKEEPER ("Waterkeeper" or "Plaintiff"), a California

nonprofit corporation, by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.    On November 6, 2023, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of Waterkeeper's notice letter is attached as Exhibit A and is incorporated by reference.

3.    More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is

diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.    Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.    INTRODUCTION

5.    This complaint seeks relief from Defendant's discharges of polluted storm water from Defendant's industrial facility located at 2154 South Street in Long Beach, California, 90805 ("Facility"). These discharges and related procedural, planning, and reporting omissions are in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. S000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as renewed by Water Quality Order No. 2015-0057-DWQ, and further amended on November 6, 2018 ("General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.    With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7.    The Los Angeles River, Los Angeles River Estuary, and the San Pedro

Bay area waters are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that Los Angeles area waters have for people in the surrounding communities. The public's use of Los Angeles area waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreation and aesthetic opportunities, such as wildlife observation are also impaired by polluted discharges into Los Angeles area waters.

8.     The Los Angeles River, Los Angeles River Estuary, and the San Pedro Bay are impaired with, among other pollutants, trash, oil, nutrients, ammonia, copper, lead, zinc, pH, cadmium, cyanide, and sediment toxicity. Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of the Los Angeles River and Estuary, and San Pedro Bay and aquatic-dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

III.   **PARTIES**

9.     Plaintiff LOS ANGELES WATERKEEPER is a nonprofit public benefit corporation organized under the laws of the State of California with its main office in Los Angeles, California. Founded in 1993, Waterkeeper is dedicated to the preservation, protection, and defense of the inland and coastal surface and groundwaters of Los Angeles County from all sources of pollution and degradation. Waterkeeper and its members are deeply concerned with protecting the environment in and around their

communities, including the Los Angeles River, Los Angeles River Estuary, and San Pedro Bay. To further these goals, Waterkeeper actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

10.    Waterkeeper has members living in the communities near the Facility and the Los Angeles River, Los Angeles River Estuary, and San Pedro Bay. They enjoy using the Los Angeles River, Los Angeles River Estuary, and San Pedro Bay and adjacent waters for recreation and other activities. Members of Waterkeeper use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause pollutants to be discharged. Members of Waterkeeper use those areas to recreate and view wildlife, among other activities. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

11.    Waterkeeper brings this action on behalf of its members. Waterkeeper's interest in reducing Defendant's discharges of pollutants into the Los Angeles River, Los Angeles River Estuary, and the San Pedro Bay and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Waterkeeper.

12.    Continuing commission of the acts and omissions alleged above will

irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy, or adequate remedy at law.

13.     Defendant DYWIDAG SYSTEMS INTERNATIONAL, USA, INC. ("Dywidag" or "Defendant") is a New York corporation that owns and/or operates the Facility located in Long Beach, California.

## IV.    STATUTORY BACKGROUND

### A. Clean Water Act

14.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

16.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. See 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that

could affect interstate commerce. The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

17.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

### B. General Permit

18.     The State Board elected to issue a statewide general permit for industrial storm water discharges ("General Permit"). The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992. The State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). On November 6, 2018, the General Permit was further amended to include additional effluent limitations and numeric action levels to be applied to industrial permittees that discharge storm water to waters that have been identified as impaired pursuant to Section 303(d) of the Act, 33 U.S.C. § 1313(d), including the Los Angeles River for zinc and nitrate + nitrite as nitrogen ("N+N").

19.     In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

20.     The General Permit contains several prohibitions. Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their

storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. General Permit, § V.A. Discharge Prohibition III.B of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges or "NSWDs") that discharge either directly or indirectly to waters of the United States. General Permit, § III.B. Receiving Water Limitation VI.C and Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized NSWDs that cause or threaten to cause pollution, contamination, or nuisance. General Permit, §§ VI.C, III.C. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. General Permit, § VI.B. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. General Permit, §§ VI.A, III.D

21.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

22.    Dischargers must develop and implement a Storm Water Pollution

Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* General Permit, § X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X.B. Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit Fact Sheet, § I(1).

23.    Sections X.D-I of the General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of industrial materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges. The General Permit requires that all dischargers develop and implement a set of minimum BMPs (which are mostly non-structural BMPs) as well as any advanced BMPs (which are mostly structural) as necessary to achieve BAT/BCT,

which serve as the basis for compliance with the General Permit's technology-based effluent limitations. *See* General Permit, § X.H. The General Permit requires a comprehensive assessment of potential pollutant sources, specific BMP descriptions; and a BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented. *See* General Permit, §§ X.G.2, 4-5. Section X.E of the General Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

24. The General Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping. *See* General Permit, § X.H.1. Failure to implement all of these minimum BMPs is a violation of the General Permit. *See* General Permit Fact Sheet, § I.2.o.

25. The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id*. The General Permit also requires that the SWPPP include BMP

Descriptions and a BMP Summary Table. *See* General Permit, § X.H.4-5.

26.    A facility must "ensure that the SWPPP identifies and justifies each minimum BMP or applicable advanced BMP not being implemented at the facility because they do not reflect best industry practice considering technological availability and economic practicability and achievability." General Permit, § X.H.4.b. A facility's SWPPP must also identify where the minimum BMPs in different areas of the facility will not adequately reduce the pollutants in the facility's storm water dischargers and identify advanced BMPs for those areas. General Permit, § X.G.2. A facility's BMPs must, at all times, be robust enough to meet the requirement of the General Permit and of 33 U.S.C. § 1342(p)(3)(A) that all discharges associated with industrial activities be subjected to BAT and BCT. General Permit, §§ V.A, I.A.1, I.D.31-32.

27.    The General Permit requires facility operators to develop and implement an adequate Monitoring Implementation Plan for visual observations and for the sampling and analysis of storm water discharges. *See* General Permit, §§ X.I, XI. The primary objective of such monitoring is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. Adequate monitoring and reporting ensure that BMPs are effectively reducing and/or eliminating pollutants at a facility and are evaluated and revised whenever appropriate to ensure compliance with the General Permit.

28.    Under the General Permit, facilities must analyze storm water samples for total suspended solids ("TSS"), Oil & Grease, pH, "[a]dditional parameters

identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, " "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix," and additional parameters applicable based on a facility's Standard Industrial Classification ("SIC") code. General Permit, § XI.B.6.

29.    Facilities are required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. General Permit, § XI.A. The General Permit requires each discharger to maintain records of all of the visual observations required by the Permit. General Permit, § XI.A.3.

30.    Section XI.B.2 of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30). Storm water discharges trigger the sampling requirement under the General Permit when they occur during facility operating hours and are preceded by 48-hours without storm water discharge. General Permit, § XI.B. A sample must be collected from each discharge point at the facility within four hours of the start of the discharge or the start of facility operations if the discharge occurs within the previous 12-hour period. General Permit, § XI.B.5.

31.    The General Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location. General Permit, § XI.A.2. "The Discharger shall visually observe and record the presence or absence of floating and

suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris, and source(s) of any discharged pollutants." General Permit, § XI.A.2.c.

32.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV. Per Section XV.F of the General Permit, a facility's Annual Evaluation must include "[a] review and effectiveness assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and are effective in reducing and preventing pollutants in industrial storm water discharges and authorized NSWDs." General Permit, § XV.F. After conducting the Annual Evaluation, "[t]he Discharger shall revise the SWPPP, as appropriate, and implement the revisions within 90 days of the Annual Evaluation." General Permit, § XV. The General Permit then requires that a Discharger submit an Annual Report which includes the date of the Annual Evaluation as well as "[a]n identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year." General Permit § XVI.

**C.** **Numeric Action Levels**

33.     The General Permit establishes annual Numeric Action Levels ("NALs") and instantaneous maximum NALs. The following annual NALs have been established under the General Permit for pollutants discharged by Dywidag, including aluminum – 0.75 mg/L; iron – 1.0 mg/L; zinc – 0.26 mg/L; and N+N – 0.68 mg/L. An exceedance of an annual NAL occurs when the average of all samples obtained for an

entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.

34.     The General Permit requires that a Discharger compare the results of its storm water discharge samples to the adopted annual NALs and instantaneous maximum NALs. General Permit, § XII.A. An exceedance of an annual NAL occurs when the average of the analytical results for a pollutant obtained for all samples at the entire facility during a single reporting year is greater than the pollutant's annual NAL. The reporting year runs from July 1 to June 30. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range (for pH).

35.     If sampling results for a given parameter indicate an NAL exceedance for that same parameter, the Discharger attains "Level 1 status," which commences on July 1 following the reporting year during which the exceedance occurred. General Permit, § XII.C. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." General Permit, § XII.D. For Level 2 Status, a discharger is required to submit an Exceedance Response Action ("ERA") Action Plan and an ERA Technical Report requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit, § XII.D.

36.     By October 1 following commencement of Level 1 status, the Discharger must complete a Level 1 Exceedance Response Action ("ERA") Evaluation. General

Permit, § XII.C.1. As part of the Level 1 ERA Evaluation, the Discharger must "[i]dentify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances." *Id.* No later than January 1 following commencement of Level 1 status, the Discharger must submit via SMARTS a Level 1 ERA Report. General Permit § XII.C.2. The Level 1 ERA report must be prepared by a Qualified Industrial Stormwater Practitioner ("QISP") and must contain "[a] summary of the Level 1 ERA Evaluation" and "[a] detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL." *Id.* A Discharger can move back to Baseline status from Level 1 status only when: (1) a Level 1 ERA report has been completed; (2) all identified additional BMPs have been implemented; and (3) results from four consecutive QSEs sampled after BMP implementation indicate no additional NAL exceedances for that parameter." *Id.*

**D. Numeric Effluent Limitations**

37.     On November 6, 2018, the State Board amended the General Permit to include Numeric Effluent Limitations ("NELs") for certain pollutants in certain watersheds of the State that are impaired by pollutants. Relevant to Dywidag's discharges, the State Board adopted Instantaneous Maximum NELs of 0.159 mg/L for zinc, 8.0 mg/L for N+N, 8.0 mg/L for nitrate-nitrogen, and 1.0 mg/L for nitrite-nitrogen being discharged to the Los Angeles River watershed pursuant to the General Permit. General Permit, Attachment E, Table E-2, p. 35.

38.     "An instantaneous maximum NEL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting

year exceeds the instantaneous maximum NEL value." General Permit, Attachment C, p. 5. The Los Angeles River NELs for zinc, N+N, nitrate-nitrogen, and nitrite-nitrogen went into effect on July 1, 2020.

39.     The EPA also has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Dywidag for industries within SIC Code 3496: zinc – 0.132 mg/L (hardness of 100-124.99 mg/L); aluminum – 1.1 mg/L; and N+N – 0.68 mg/L.

40.     Compliance with the NELs is in addition to the requirements triggered by an exceedance of the NALs for the same pollutants. Amended General Permit Fact Sheet, p. 41.

41.     Upon the determination that the Facility's storm water discharges exceeded an NEL, the General Permit mandates that the Facility do the following:

      a.  Conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the Storm Water Pollution Prevention Plan ("SWPPP") have been properly implemented;

      b.  Assess the facility's SWPPP and its implementation to determine whether additional BMPs or SWPPP implementation measures are necessary to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI); and,

c. Certify and submit via SMARTS documentation based upon the above facility evaluation and assessment that: i. Additional BMPs and/or SWPPP implementation measures have been identified and included in the SWPPP to meet the Receiving Water Limitations (Section VI) or applicable NELs (Attachment E); or ii. No additional BMPs or SWPPP implementation measures are required to reduce or prevent pollutants in industrial storm water discharges to meet the Receiving Water Limitations (Section VI) or applicable NELs (Attachment E).

General Permit, § XX.B.1.

42. The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

**E. Basin Plan**

43. The Regional Board has identified beneficial uses and established water quality standards for the Los Angeles River, the Los Angeles River Estuary, and the San Pedro Bay, in the "Water Quality Control Plan, Los Angeles Region Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties," generally referred to as the Basin Plan.

44. The beneficial uses of these waters include, among others, commercial and sport fishing, estuarine habitat, marine habitat, wildlife habitat, rare, threatened, or endangered species, migration of aquatic organisms, and spawning, reproduction, and/or early development, water contact recreation, and noncontact water

recreation.  Noncontact water recreation use is defined as "Uses of water for recreational activities involving proximity to water, but not normally involving body contact with water, where ingestion of water is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities." Contact recreation includes swimming, wading, water-skiing, skin and scuba diving, surfing, white water activities, fishing, and uses of natural hot springs.

45.    Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge, in violation of the General Permit.

46.    The Basin Plan includes a narrative biostimulatory substance standard which states, "Waters shall not contain biostimulatory substances in concentrations that promote aquatic growth to the extent that such growth causes nuisance or adversely affects beneficial uses."

47.    The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

48.    The EPA has adopted freshwater numeric water quality standard for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC") based on a default hardness of 100 mg/L. 65 Fed. Reg. 31712 (May 18, 2000) (California Toxics Rule).

49.    The EPA 303(d) List of Water Quality Limited Segments lists Reach 2 of

the Los Angeles River as impaired for trash, oil, nutrients, ammonia, copper, and lead, among other pollutants. *See* https://www.waterboards.ca.gov/water_issues/programs/tmdl/2018state_ir_reports_final/2018_assessments.xlsx. Reach 1 of the Los Angeles River is impaired for zinc, lead, copper, trash, pH, nutrients, ammonia, cadmium, and cyanide, among other pollutants. The Los Angeles River Estuary is impaired for trash and sediment toxicity, among other pollutants. San Pedro Bay is impaired for sediment toxicity, among other pollutants.

**F. CITIZEN ENFORCEMENT.**

50.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $64,618 per day per violation for violations occurring after November 2, 2015, where penalties are assessed on or after January 6, 2023, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

51.     Self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

**V.     STATEMENT OF FACTS**

52.     Defendant owns and/or operates the Facility, known as Dywidag Systems

International, USA, Inc., that engages in the manufacturing of covered steel cable and bars consisting of steel encased in a plastic that is applied to the steel via melting the plastic and molding it to the outside of the steel.

53.  The Facility falls within Standard Industrial Classification ("SIC") Code 3496 ("Miscellaneous Fabricated Wire Products").

54.  Plaintiff is informed and believes, and thereupon alleges, that Defendant has operated the Facility since prior to December 30, 2018.

55.  Plaintiff is informed and believes, and thereupon alleges, that on or about March 18, 2016, Defendant filed a Notice of Intent enrolling the Facility in the General Permit.

56.  The Facility collects storm water from its approximately 3.5-acre industrial site and discharges storm water from at least one discharge location at the Facility. According to the Facility's SWPPP, as amended in February 2024, a single discharge location has been identified at the Facility on the north side of the Facility's property which discharges storm water to the City of Long Beach's municipal separate storm sewer, which in turn drains to the Los Angeles River.

57.  Plaintiff is informed and believes, and thereupon alleges, that storm water associated with industrial activities discharges from the Facility during rain events with daily precipitation of 0.1 inches or more.

58.  Plaintiff is informed and believes, and thereupon alleges, that storm water discharged from the Facility flows into underground storm drains that empty into the Los Angeles River, Los Angeles River Estuary, and San Pedro Bay, and ultimately flows to the Pacific Ocean (collectively, "Facility Receiving Waters").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

59.     The Los Angeles River is a water of the United States. The Los Angeles River Estuary is a water of the United States. The San Pedro Bay is a water of the United States. The Pacific Ocean is a water of the United States.

60.     Plaintiff is informed and believes, and thereupon alleges, that storm water flows over the surface of the Facility where industrial activities occur, including activities associated with the manufacturing of covered steel cable and bars including grout mixing; finishing of products; cutting, grinding, welding, loading, transport, and storage.

61.     Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects particulates, metals including zinc, inorganic compounds including N+N, and other pollutants as it flows towards the storm water discharge location at the Facility.

62.     Plaintiff is informed and believes, and thereupon alleges that all storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

63.     Plaintiff is informed and believes, and thereupon alleges, that there are insufficient structural storm water control measures installed at the Facility. Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States. The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated. The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

64.     Since and prior to December 30, 2018, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility. The sample results were submitted to the State Board via SMARTS.

65.     In the storm water sampling results submitted to the State Board since December 30, 2018, the Facility has reported high pollutant levels from its storm water sampling results. Based on the Facility's storm water sampling results, Plaintiff is informed and believes, and thereupon alleges, that Defendant has discharged and continues to discharge storm water with unacceptable levels of zinc and N+N.

## A. VIOLATIONS OF ZINC NUMERIC EFFLUENT LIMITATION

66.     The Facility exceeded the applicable total instantaneous maximum NEL for zinc during the 2020-2021, 2021-2022, and 2023-2024 Reporting Years. These discharges of pollutants from the Facility are evidence of violations of Effluent Limitation V.C.1 of the General Permit.

67.     During the 2020-2021 reporting year, the levels of zinc in two or more sampling results of storm water discharged from the Facility exceeded the applicable total instantaneous maximum NEL for zinc of 0.159 mg/L. On January 29, 2021, the level of zinc measured in storm water at discharge location DP#1 was 0.94 mg/L. On March 3, 2021, the level of zinc measured in storm water at discharge location DP#1 was 0.19 mg/L.  Each of these discharges of zinc is a separate violation of the General Permit.

68.     During the 2021-2022 reporting year, the levels of zinc in two or more sampling results of storm water discharged from the Facility exceeded the applicable total instantaneous maximum NEL for zinc of 0.159 mg/L. On October 25, 2021, the

level of zinc measured in storm water at discharge location DP#1 was 0.85 mg/L. On December 14, 2021, the level of zinc measured in storm water at discharge location DP#1 was 0.9 mg/L. On December 23, 2021, the level of zinc measured in storm water at discharge location DP#1 was 0.47 mg/L. On March 28, 2022, the level of zinc measured in storm water at discharge location DP#1 was 2.3 mg/L. Each of these discharges of zinc is a separate violation of the General Permit.

69.     During the 2023-2024 reporting year, thus far, the levels of zinc in two or more sampling results of storm water discharged from the Facility exceeded the annual NEL for zinc of 0.159 mg/L. On November 15, 2023, the level of zinc measured in storm water at discharge location DP#1 was 0.607 mg/L. On December 20, 2023, the level of zinc measured in storm water at discharge location DP#1 was 0.178 mg/L. Each of these discharges of zinc is a separate violation of the General Permit.

70.     On information and belief, Petitioner alleges Defendant would have had additional NEL exceedances in 2022-2023, 2021-2022, and 2020-2021 if required sampling had occurred.

71.     On information and belief, Plaintiff alleges that Defendant has failed to comply with the General Permit requirements to evaluate and identify additional BMPs to comply with the NEL for zinc. General Permit, §§ XX.B.1; VII.E.

72.     Dywidag determined that the Facility's storm water discharges exceeded the NELs for zinc upon receipt of the March 3, 2021 report from Alpha Analytical Laboratories, Inc. setting forth the analytical results demonstrating the second exceedance of the zinc NEL during the 2020-2021 reporting year.

73.     In December 2021, and subsequently revised in August 2022 and February 2024, Dywidag prepared and submitted a Water Quality Based Corrective Action Report ("WQBCA Reports"). The WQBCA Reports purport to comply with General Permit, § XX.B.1.c.i that "[a]dditional BMPs and/or SWPPP implementation measures have been identified and included in the SWPPP to meet the Receiving Water Limitations (Section VI) or applicable NELs…." The additional BMPs identified in the WQBCA Reports were limited to increasing the maintenance of existing treatment control BMPs (downspout filters) by replacing media filters, increase vacuuming effectiveness in areas impacted by dust and particulates, and enact better containment of dust generating processes, including dust guards. Maintenance is an existing requirement for any installed BMP. Nevertheless, the 2022 WQBCA Report indicates maintenance of the Facility's downspout filters would be conducted by October 2021. The additional dust control measure included installing longer guards for grinding booth to better contain dust and particulates by December 2021. Based on these BMPs, the 2022 WQBCA Report concludes that, "[a]dditional BMPs and SWPPP implementation measures are expected to reduce pollutant discharges to meet Receiving Water Limitations."

74.     After the date of implementing the actions identified in the 2022 WQBCA Report, the zinc level reported at DP#1 during the 2021-2022 reporting year increased by more than 100%. The one sample taken during the 2022-2023 reporting year also remained in excess of the NEL concentration and exceeded the zinc NAL. The two samples thus far taken in 2023-2024 reporting year already exceed the NEL for zinc. The average of the two zinc results for the 2023-2024 reporting currently

exceed the zinc NAL. Thus, LAW is further informed and believes that Dywidag did not have any documentation and improperly certified that the proposed changes to the SWPPP contained in the 2022 WQBCA Report would be sufficient to meet the zinc NEL.

75.     The most recent 2024 WQBCA Report fails to certify that "[a]dditional BMPs and/or SWPPP implementation measures have been identified and included in the SWPPP to meet the [the] applicable NELs." General Permit, § XX.B.1.c.i. Instead, the 2024 WQBCA Report states that during the upcoming calendar year, "the facility is considering additional corrective actions to identify pollutant sources and improving facility BMPs including" additional mechanical sweeping, the use of an on-site filtration system, and infrastructure upgrades." Accordingly, Dywidag has failed to conduct the required BMP evaluation and identification of additional BMPs or SWPPP implementation measures necessary to meet the zinc NEL in violation of General Permit, § XX.B.1.c.i. These violations are ongoing.

**B. BAT, BCT AND RECEIVING WATER VIOLATIONS**

76.     Since December 30, 2018, Plaintiff is informed and believes that the Facility has reported discharges of storm water containing pollutants in excess of applicable NALs for zinc and N+N. These discharges of pollutants from the Facility have violated Discharge Prohibitions III.A, III.B, III.C, and III.D and Receiving Water Limitations VI.A, VI.B, and VI.C of the General Permit and are evidence of ongoing violations of Effluent Limitation V.A of the General Permit.

77.     During the 2018-2019 reporting year, the levels of zinc in storm water detected at the Facility exceeded the annual NAL for zinc of 0.26 mg/L. On December

6, 2018, the level of zinc measured in storm water at discharge location DP#1 was 0.29 mg/L. On January 1, 2019, the level of zinc measured in storm water at discharge location DP#1 was 1.3 mg/L. The average of all zinc measurements taken at the Facility during the 2018-2019 reporting year was 0.795 mg/L, above the annual NAL for zinc.

78.     During the 2019-2020 reporting year, the level of zinc in storm water detected at the Facility exceeded the annual NAL for zinc of 0.26 mg/L. On December 4, 2019, the levels of zinc measured in storm water at discharge location DP#1 was 0.14 mg/L. On March 12, 2020, the level of zinc measured in storm water at discharge location DP#1 was 0.41 mg/L. The average of all zinc measurements taken at the Facility during the 2019-2020 reporting year was 0.275 mg/L, above the annual NAL for zinc.

79.     During the 2020-2021 reporting year, the levels of zinc in storm water detected at the Facility exceeded the annual NAL for zinc of 0.26 mg/L. On March 29, 2021, the level of zinc measured in storm water at discharge location DP#1 was 0.94 mg/L. On March 3, 2021, the level of zinc measured in storm water at discharge location DP#1 was 0.19 mg/L. The average of all zinc measurements taken at the Facility during the 2020-2021 reporting year was 0.565 mg/L, above the annual NAL for zinc.

80.     During the 2021-2022 reporting year, the levels of zinc in storm water detected at the Facility exceeded the annual NAL for zinc of 0.26 mg/L. On October 25, 2021, the level of zinc measured in storm water at discharge location DP#1 was 0.85 mg/L. On December 14, 2021, the level of zinc measured in storm water at

discharge location DP#1 was 0.9 mg/L. On December 23, 2021, the level of zinc measured in storm water at discharge location DP#1 was 0.47 mg/L. On March 28, 2022, the level of zinc measured in storm water at discharge location DP#1 was 2.3 mg/L. The average of all zinc measurements taken at the Facility during the 2021-2022 reporting year was 1.13 mg/L, above the annual NAL for zinc.

81.    During the 2022-2023 reporting year, the levels of zinc in storm water detected at the Facility exceeded the annual NAL for zinc of 0.26 mg/L. On February 24, 2023, the level of zinc measured in storm water at discharge location DP#1 was 0.27 mg/L. The average of all zinc measurements taken at the Facility during the 2022-2023 reporting year to date was 0.27 mg/L, above the annual NAL for zinc.

82.    During the 2023-2024 reporting year, thus far, the levels of zinc in storm water detected at the Facility have exceeded the annual NAL for zinc of 0.26 mg/L. On November 15, 2023, the level of zinc measured in storm water at discharge location DP#1 was 0.607 mg/L. On December 20, 2023, the level of zinc measured in storm water at discharge location DP#1 was 0.178 mg/L. The average of all zinc measurements taken at the Facility to date during the 2023-2024 reporting year to date is 0.393 mg/L, above the annual NAL for zinc.

83.    The levels of zinc detected in storm water at the Facility have exceeded the sector-specific EPA benchmark for zinc of 0.132 mg/L.

84.    The levels of zinc detected in storm water at the Facility have exceeded the numeric water quality standard for zinc of 0.120 (CMC) mg/L established by EPA in the California Toxics Rule.

85.    During the 2020-2021 reporting year, the levels of N+N in storm water

detected at the Facility exceeded the annual NAL for N+N of 0.68 mg/L. On January 29, 2021, the level of N+N measured in storm water at discharge location DP#1 was 0.53 mg/L. On March 3, 2021, the level of N+N measured in storm water at discharge location DP#1 was 1.1 mg/L. The average of all N+N measurements taken at the Facility during the 2020-2021 reporting year was 0.815 mg/L, which is above the annual NAL for N+N.

86.    During the 2021-2022 reporting year, the levels of N+N in storm water detected at the Facility exceeded the annual NAL for N+N of 0.68 mg/L. On October 25, 2021, the level of N+N measured in storm water at discharge location DP#1 was 1.0 mg/L. On December 14, 2021, the level of N+N measured in storm water at discharge location DP#1 was 0.27 mg/L. On December 23, 2021, the level of N+N measured in storm water at discharge location DP#1 was 0.9 mg/L. On March 28, 2022, the level of N+N measured in storm water at discharge location DP#1 was 1.4 mg/L. The average of all N+N measurements taken at the Facility during the 2021-2022 reporting year was 0.893 mg/L, above the annual NAL for N+N.

87.    During the 2023-2024 reporting year, thus far, the levels of N+N in storm water detected at the Facility have exceeded the annual NAL for N+N of 0.68 mg/L. On November 15, 2023, the level of N+N measured in storm water at discharge location DP#1 was 8.1 mg/L. On December 20, 2023, the level of N+N measured in storm water at discharge location DP#1 was 6.0 mg/L. The average of all N+N measurements taken at the Facility during the 2023-2024 reporting year to date is 7.05 mg/L, above the annual NAL for N+N.

88.    The levels of N+N detected in storm water at the Facility have exceeded

1  the sector-specific EPA benchmark for N+N of 0.68 mg/L.

2      89.    On information and belief, Plaintiff alleges that since at least December
3  30, 2018, Defendant has failed to implement BAT and BCT at the Facility for its
4  discharges of zinc, N+N, and other potentially un-monitored pollutants.  Effluent
5  Limitation V.A of the General Permit requires that Defendant implement BAT for
6  toxic and nonconventional pollutants and BCT for conventional pollutants by no later
7  than October 1, 1992 or since the date the Facility opened. The General Permit further
8  requires dischargers to implement and maintain, to the extent feasible, any one or
9  more of the following advanced BMPs necessary to reduce or prevent discharges of
10  pollutants in industrial storm water discharges: exposure minimization BMPs, storm
11  water containment and discharge reduction BMPs, treatment control BMPs, and other
12  advanced BMPs. *See* General Permit, § X.H.2. Failure to implement advanced BMPs
13  as necessary to achieve compliance with either technology or water quality standards
14  is a violation of the General Permit. *Id*. A Facility's BMPs must, at all times, be robust
15  enough to meet the General Permit's and 33 U.S.C. § 1342(p)(3)(A)'s requirement
16  that all discharges associated with industrial activities be subjected to BAT and BCT.
17  General Permit §§ V.A, I.A.1, I.D.31-32.

18      90.    Based on the pollutant levels in the Facility's storm water discharges, the
19  BMPs implemented to date at the Facility do not represent BAT and BCT. Based on
20  the Facility's continued exceedances of NALs, Plaintiff is informed and believes, and
21  thereupon alleges, that Dywidag has failed to implement the necessary BMPS, despite
22  there being advanced BMPs available, including additional treatment equipment that
23  should have been implemented at the Facility. As of the date of this Complaint,

Defendant has failed to implement minimum BMPs and advanced BMPs that achieve BAT and BCT.

91.     Since at least December 30, 2018, Dywidag has been and continues to violate Section X.C.1.b of the General Permit because the Facility's SWPPP fails to identify and describe appropriate advanced BMPs. General Permit, § X.C.1.b. The SWPPP also must identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for their exclusion. *Id*, § X.H.4.b. Given the high levels of zinc and N+N measured in the Facility's discharge, in order to comply with the General Permit's BAT/BCT requirement, the Facility's SWPPP must identify advanced BMPs necessary to implement the BAT/BCT requirements and achieve the NELs and NALs, including storm water treatment, and explain why available BATs are not being implemented at the Facility. Each of these violations has occurred every day since at least December 30, 2018 and are ongoing.

92.     Plaintiff is informed and believes, and thereupon alleges, that during the last five rainy seasons and continuing through to the time of filing this Complaint, Defendant has discharged storm water from the Facility contaminated with zinc and N+N in excess of one or more applicable NALs, the zinc water quality standard, in violation of Effluent Limitation V.A, Discharge Prohibitions III.A, III.B, III.C, and III.D, and Receiving Water Limitations VI.A, VI.B, and VI.C of the General Permit. Plaintiff is informed and believes, and thereupon alleges, that storm water discharges containing these pollutants in violation of the General Permit have also occurred from the Facility on other rain dates listed in Attachment A of Exhibit A.

**C. MONITORING, REPORTING AND TRAINING VIOLATIONS**

93.    From the 2018-2019 rainy season to the present, Plaintiff is informed and believes, and thereupon alleges that Defendant has taken only thirteen samples of storm water from the Facility.

94.    Plaintiff is informed and believes, and thereupon alleges that Defendant has failed and continues to fail to collect storm water discharge samples from all QSEs as required by Section XI.B.3 of the General Permit.

95.    Defendant failed to collect and analyze a second sample from DP#1 during the first half of the 2018-2019 reporting year. Plaintiff is informed and believes and thereupon alleges that at least two QSEs occurred at the Facility during the first half of the 2018-2019 reporting year.

96.    Defendant failed to collect and analyze a second sample from DP#1 during the second half of the 2018-2019 reporting year. Plaintiff is informed and believes and thereupon alleges that at least two QSEs occurred at the Facility during the second half of the 2018-2019 reporting year.

97.    Defendant failed to collect and analyze a second sample from DP#1 during the first half of the 2019-2020 reporting year. Plaintiff is informed and believes and thereupon alleges that at least two QSEs occurred at the Facility during the second half of the 2019-2020 reporting year.

98.    Defendant failed to collect and analyze a second sample from DP#1 during the second half of the 2019-2020 reporting year. Plaintiff is informed and believes and thereupon alleges that at least two QSEs occurred at the Facility during the second half of the 2019-2020 reporting year.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

99.    Defendant failed to collect and analyze two samples from DP#1 during the first half of the 2020-2021 reporting year. Plaintiff is informed and believes and thereupon alleges that at least two QSEs occurred at the Facility during the first half of the 2020-2021 reporting year.

100.    Defendant failed to collect and analyze a second sample from DP#1 during the second half of the 2021-2022 reporting year. Plaintiff is informed and believes and thereupon alleges that at least two QSEs occurred at the Facility during the second half of the 2021-2022 reporting year.

101.    Defendant failed to collect and analyze two samples from DP#1 during the first half of the 2022-2023 reporting year. Plaintiff is informed and believes and thereupon alleges that at least two QSEs occurred at the Facility during the first half of the 2022-2023 reporting year.

102.    Defendant failed to collect and analyze a second sample from DP#1 during the second half of the 2022-2023 reporting year. Plaintiff is informed and believes and thereupon alleges that at least two QSEs occurred at the Facility during the second half of the 2022-2023 reporting year.

103.    As a result, Dywidag has violated Section § XI.B.2 at least 10 times in the last five years by failing to take the requisite samples from Qualifying Storm Events.

104.    Defendant has failed to ensure employees are properly trained to implement the requirements of the General Permit. The General Permit's minimum BMPs require each discharger to maintain an Employee Training Program and mandates that "the Discharger shall ensure that all team members implementing the

various compliance activities of this General Permit are properly trained to implement the requirements of this General Permit, including but not limited to: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. General Permit, § X.H.1.f.i. In the Facility's annual report for the 2022-2023 rain year, Defendant reported that "[o]ur facility did not collect the required number of samples during the 2022-2023 year due to improper sampling technique performed by personnel. Pollution Prevention Team has been retrained on correct sampling techniques and will collect samples correctly in the future." 2022-2023 Annual Report. Likewise, the 2022-2023 annual report states: "[s]ome samples were discarded due to improper sampling technique. Facility personnel has been re-trained and will sample correctly in the future." As a result, Dywidag has violated and continues to violate Section X.H.1.f.i. of the General Permit. Plaintiff is informed and believes and thereupon alleges that Defendant's failure to comply with the General Permit's training requirements are ongoing.

105.   In addition, since at least December 30, 2018, the Defendant's SWPPP fails to identify procedures for alternate team members in violation of the General Permit. General Permit, § X.D.1.c. The 2021 SWPPP states that "DSI has a process of training and assigning multiple individuals to perform SWPP roles whenever needed. Also, individuals assigned to replace these team members during an absence will fulfill the SWPP Team Responsibilities as part of the assignment." 2024 SWPPP, p. 2. Such statement is insufficient because the SWPPP does not detail procedures that would assure the availability of qualified team members, such as during qualifying rain events. General Permit, § X.D.1.c.

106.   Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged from the Facility during rain events into underground storm drains at the Facility that empty into the Los Angeles River, which flows into the Los Angeles River Estuary and San Pedro Bay, and ultimately the Pacific Ocean.

107.   Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit. Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of Numeric Effluent Limitations.**
**(33 U.S.C. §§ 1311, 1342)**

108.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

109.   Defendant has discharged storm water from the Facility, as set forth above, in violation of Effluent Limitation V.C set forth in the General Permit.

110.   Once the Facility obtained two (2) or more analytical results from samples taken for zinc within a reporting year that exceeded the instantaneous maximum NEL value, each exceedance is a separate and distinct violation of Effluent

Limitation V.C of the General Permit.

111.   Defendant's violations will continue each day it discharges levels of zinc in violation of the NEL for zinc.

112.   Each and every violation of Effluent Limitation V.C of the General Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

## SECOND CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violation of Permit Conditions and the Act 33 U.S.C. §§ 1311, 1342)

113.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

114.   The General Permit's SWPPP requirements and Effluent Limitation V.A require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement advanced BMPs, and BAT and BCT at the Facility for their discharges of zinc and N+N in violation of Effluent Limitations V.A and X.H of the General Permit.

115.   Each day since December 30, 2018, that Defendant has failed to develop and implement advanced BMPs and BAT/ BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

116.   Defendant has been in violation of the BMP and BAT/BCT requirements every day since at least December 30, 2018. Defendant continues to be in violation of

the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

### THIRD CAUSE OF ACTION
**Failure to Perform Water Quality-Based Corrective Actions**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

117.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

118.   Defendant is required to perform certain actions when it determines that its industrial storm water discharges are in violation of Receiving Water Limitations or when its discharges exceed an NEL.

119.   As of March 3, 2021, Defendant was required to prepare and submit a Water Quality Based Corrective Action Report addressing the Facility's violations of the zinc NEL. The Water Quality Based Corrective Action Report was required to certify either that "[a]dditional BMPs and/or SWPPP implementation measures have been identified and included in the SWPPP to meet the … applicable NELs" or that no additional measures were needed to meet the NELs.

120.   In each of its past WQBCA Reports submitted to address the Facility's violations of the zinc NEL, Defendant either did not have the requisite documentation to certify that proposed changes to the SWPPP contained in its WQBCA Report would be sufficient to meet the zinc NEL or Defendant failed to certify that it had identified additional BMPs or SWPPP implementation measures necessary to meet the zinc NEL.

121.   Every day since March 3, 2021, Defendant has failed to properly identify

and implement the required water quality-based corrective actions in violation of Sections XX.B.1 and VII.E of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Defendant continues to be in violation of these requirements each day that it fails to complete the required actions.

## FOURTH CAUSE OF ACTION
### Discharges of Pollutants in Excess of Receiving Water Limits
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

122.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

123.   Receiving Water Limitation VI.C and Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impacts human health or the environment. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

124.   Plaintiff is informed and believes, and thereupon alleges, that since at least December 30, 2018, Defendant has been discharging polluted storm water from the Facility in excess of the applicable water quality standards for zinc and N+N in violation of Receiving Water Limitations VI.A, VI.B, and VI.C, and Discharge Prohibition III.C and III.D of the General Permit.

125.   During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with zinc, N+N, and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water from the Facility flows untreated into storm drains at the Facility. Plaintiff is informed and believes, and thereupon alleges, that storm water from the Facility flows through underground storm drains into the Los Angeles River, Los Angeles River Estuary, and San Pedro Bay, which then ultimately flows to the Pacific Ocean.

126.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

127.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water cause or threaten to cause pollution, contamination, or nuisance in violation of Receiving Water Limitation VI.C and Discharge Prohibition III.C of the General Permit.

128.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.B of the General Permit.

129.   Plaintiff is informed and believes, and thereupon alleges, that unauthorized non-stormwater discharges have been occurring at the Facility as a result of inadequate BMPs to prevent non-storm water discharges.

130.   Every day since at least December 30, 2018 that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

### FIFTH CAUSE OF ACTION
**Failure to Develop and Implement an
Adequate Monitoring Implementation Plan
(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

131.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

132.   The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, inter alia, sampling and analysis of discharges).

133.   Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility. General Permit, §§ X(I), XI, and §X.H.1.f.i. Defendant's ongoing failure to develop and implement an adequate Monitoring Implementation Plan for the Facility is evidenced by Defendant's failure to conduct required sampling, analysis, and proper employee training.

134.   Since the 2018-2019 reporting year, Defendant has failed to collect and analyze storm water samples from two QSEs within the first half of each reporting year and two QSEs within the second half of each reporting year. General Permit, § XI.B.2.

135.   Since at least December 30, 2018, Defendant has failed to collect and analyze samples from requisite QSEs on at least 10 occasions.

136.   Each day since at least December 30, 2018, that Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). Each day since at least December 30, 2018, that Defendant has failed to collect and analyze a storm water sample for at least two QSEs for each half of a reporting year is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**SIXTH CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and**
**Update an Adequate Storm Water Pollution Prevention Plan**
**(Violation of Permit Conditions and the Act 33 U.S.C. §§ 1311, 1342)**

137.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

138.   Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

139.   Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, inter alia, Defendant's failure to identify and describe advanced BMPs at the Facility.

140.   Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring as required by Sections XV and XVI of the General Permit.

141.   Each day since December 30, 2018, that Defendant has failed to develop, implement, and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

142.   Defendant has been in violation of the Permit's SWPPP requirements every day since December 30, 2018. Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**SEVENTH CAUSE OF ACTION**
**Failure to Ensure Employees are Properly Trained**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

143.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

144.   The General Permit's minimum BMPs requires each discharger to maintain an Employee Training Program.

145.   Plaintiff is informed and believes, and thereupon alleges, that during the 2022-2023 rain year, Defendant failed to maintain such program in violation of Section X.H.1.f.i. of the General Permit.

146.   Defendant has been in violation of the Permit's training requirements every day since at least December 30, 2018. Defendant continues to be in violation of the training requirements each day that it fails to develop and fully implement an adequate training program for the Facility.

**VII.   RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.  Order Defendant to ensure employees are properly trained and that proper training procedures and techniques are in place pursuant to the General Permit.

g.  Order Defendant to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.  Order Defendant to pay civil penalties of up to $64,618 per day per violation;

1

2

   j. Order Defendant to take appropriate actions to restore the quality of

waters impaired or adversely affected by their activities;

3

4

   k. Award Plaintiff's costs (including reasonable investigative, attorney,

5

witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

6

§ 1365(d); and,

7

   l. Award any such other and further relief as this Court may deem

8

appropriate.

9

Dated: February 28, 2024  Respectfully submitted,

10

11

      By: /s/ *Michael R. Lozeau*

12

        Michael R. Lozeau

13

        LOZEAU DRURY LLP

14

        Attorneys for Los Angeles Waterkeeper

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT         43